IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

FRADARIO BRIM,

                    Plaintiff,

        v.                                              OPINION & ORDER

MICHAEL DONOVAN, CHAD FRAPPIER, and                     15-cv-658-jdp
SCOTT ECKSTEIN,

                    Defendants.[1]

Pro se plaintiff Fradario Brim is a Muslim prisoner incarcerated at the Green Bay Correctional Institution (GBCI). In the spring of 2015, defendant Correctional Officer Chad Frappier, the GBCI chapel officer, wrote several reports concerning Brim's activities during Talim, a Muslim religious service held at the GBCI chapel. Defendant Chaplain Michael Donovan reviewed these reports and had a discussion with non-party GBCI Security Director John Kind, which resulted in Kind directing Donovan to bar Brim from attending any congregate religious services for 90 days. Around the same time, Donovan compiled a list of inmates who wished to fast during Ramadan that year—Brim's name wasn't on that list, even though he had participated in Ramadan for many years and wanted to participate that year. As a result, Brim did not receive specially timed Ramadan meals from the GBCI cafeteria and was forced to choose among buying food, not eating, or violating the strictures of his religion by eating meals in the cafeteria.

---

[1] I have updated the caption to reflect defendants' full names.

Brim has sued defendants Frappier, Donovan, and GCBI Warden Scott Eckstein over their actions in 2015, claiming that they violated his free exercise and free speech rights under the First Amendment and his religious rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA) by barring him from attending congregate religious services and properly participating in Ramadan because of his religious speech. Defendants contend that they needed to bar Brim from attending congregate religious services because of his disruptive behavior and suspected drug smuggling and that Brim didn't get Ramadan meals because he didn't sign up for them on time. They have moved for summary judgment on all of Brim's claims. Dkt. 19. Brim has abandoned several of his claims, and his sole remaining RLUIPA claim is moot. But disputes of fact preclude summary judgment on the remaining free exercise and retaliation claims: Brim's version of the facts shows that he wasn't disruptive and wasn't smuggling drugs, calling into question defendants' justification for their actions. Those claims remain for trial.

UNDISPUTED FACTS

The following facts are undisputed, except where noted.

Brim is an inmate in the custody of the Wisconsin Department of Corrections (DOC). He has been incarcerated at GBCI since 2012. Michael Donovan is the GBCI chaplain. He plans, administers, and supervises GBCI's religious programming for the DOC's recognized Umbrella Religion Groups (URG), including Islam. The religious programming for the Islamic URG includes an Islamic Talim study group and Salat al-Jum'ah, or Friday prayers, both of which are held in the GBCI chapel. An outside volunteer often leads Salat al-Jum'ah; but Talim is organized by the inmates, who sit in one or more circles and discuss the Qur'an, the Prophet

Muhammad's teachings, and other Islamic topics. Brim, a practicing Muslim, has been part of the Islamic URG since 1995. He regularly attends Talim and Jum'ah, maintains a Halal diet, and fasts during Ramadan. He used to work in the chapel library, checking out religious books to other inmates.

In early 2014, Donovan observed Brim's Talim discussions increase in intensity "to the point where he was telling other inmates they had to believe exactly as he believed and practice exactly the way he practiced." Dkt. 22, ¶ 11. He was concerned that the "tension within the Talim group . . . could result in a physical altercation." *Id.* So he and the chapel officer at the time, Correctional Officer Stone, met with Brim. According to defendants, Donovan and Stone told Brim "that he could not dictate to other inmates what they had to believe and practice." *Id.* Brim does not dispute Donovan's observations about his behavior or the fact that a meeting took place, but he says that he has "never been admonished by Donovan or Officer Stone for extremist, disruptive, threatening, or domineering attitudes." Dkt. 30, ¶ 42. Donovan admits that he has never witnessed Brim espouse "extremist views" or "threaten or verbally abuse" GBCI staff or inmates and has never written an incident report or conduct report concerning Brim's disruptive behavior. Dkt. 41-1, at 1, 2, 7.

In May 2014, Chad Frappier became the GBCI chapel officer at GBCI. (He'd been working as a correctional officer at GBCI since 1991.) When he began working in the chapel, he was told that "there was an issue concerning Brim and how he was trying to lead the Muslim services" and that Donovan and Stone had already spoken to Brim about "how that was not allowed in the institution." Dkt. 24, ¶ 6. A Division of Adult Institutions (DIA) policy provides, "Under no circumstances will an inmate be authorized to lead or conduct a religious service or

study group." Dkt. 22-1, at 3. Brim disputes whether leading a Talim group is prohibited at GBCI in practice. *See* Dkt. 49, ¶ 33 and Dkt. 30, ¶ 38.

## A. January 13 Talim

On January 13, 2015, Frappier issued Brim a conduct report concerning Brim's involvement in a heated discussion during Talim. Frappier said that Brim and another inmate, Darin Cobb, were debating "something in the Quran" with "slightly elevated" voices and that Brim appeared to be "challenging Cobb in a verbal way that often leads to an argument." Dkt. 24-2, at 1. Frappier described Brim as "incessant[ly] ranting" and explained that "[w]hat transpired at this study group, which should be a group discussion, turned into an intense heated argument that is not allowed at any religious group or study at GBCI." *Id.* at 2, 4. According to Frappier, he asked Donovan to end Talim early and then followed the inmates back to their cell hall while Cobb continued to argue with another inmate, Andre Simpson; Brim hugged Simpson until Frappier told him to "break it up[,] and he did." *Id.* at 4.

In an incident report written on the same day, Frappier gave his "opinion of the situation": "Brim wants to be a leader and won't let anyone take away from him being the center of attention . . . he commands some kind of respect from the others . . . I believe he was setting up Cobb for a fight." Dkt. 24-1, at 2, 3. He also mentioned that "[a]bout a month ago an issue being talked about in the Talim circle was something called zakat," which he thought meant "poor box or store for the muslim group." *Id.* at 3. A supervisor commented on this, stating that according to Donovan, "there is no evidence that the inmates are paying Zakat either by money or in canteen goods." *Id.* But because of Frappier's hunch, the supervisor encouraged "increased rounds in the chapel during the periods when this group meets." *Id.*

Brim had a hearing on Frappier's conduct report. He was found not guilty of disobeying orders and inciting a disturbance, but he was found guilty of disruptive conduct and lost 30 days of recreation as a penalty. Dkt. 24-2, at 8. Brim appealed this finding; it was affirmed.

According to Brim, Frappier issued the January 13 conduct report because he was upset about a different conversation Brim held with another inmate, Allen Davis, shortly before Talim began the week prior. Brim was advising Davis on how to explain to his friends and family that Islam is the one true religion and telling Davis that a female officer soliciting a sexual relationship with Davis would be inappropriate under both DOC regulations and Islamic law. When Frappier heard Brim and Davis's conversation, he said, "If you come over here to run your mouth, you know, you all can leave right now. You can leave right now." Dkt. 18 (Brim dep. 41:2-4). Brim believes Frappier was upset about the topic of solicitation because Frappier's ex-wife had been fired recently for soliciting an inmate. Frappier may have been upset about the religious topic as well, because Davis says that Frappier later told him, "You shouldn't let Brim tell you your family isn't going to Heaven." Dkt. 31, ¶ 4. Another Talim participant heard Frappier tell Donovan "that he didn't have a problem with Brim until he talked about staff being disciplined for staff misconduct and said all non-Muslims would go to Hell." Dkt. 36, ¶ 10.

Brim says that his conversation with Davis led Frappier to issue the January 13 incident report, which "extremely exaggerated" the events of that day's Talim. Dkt. 18 at 45:3. Just before Talim began, Brim says, he and Cobb had a "normal" debate about whether one of Brim's books exhibited shirk (the sin of polytheism). *Id.* at 50:1. During Talim, Cobb sat outside of the circle, interrupting Brim and the other inmates and "yelling his argument to the circle." *Id.* at 54:7. Members of the Talim circle would occasionally respond to Cobb. Frappier

observed this but never told the inmates to stop arguing. Eventually, he went into Donovan's office, and Donovan came out to tell the group that Talim would be ending early that day. All of the inmates, including Brim, left the chapel. Brim hugged Cobb and Simpson before going to his cell because "Muslims do that" when they say goodbye. *Id.* at 67:24.

**B. April 10 Talim**

On April 10, 2015, Frappier wrote another incident report concerning Brim's actions during Talim. He explained that Talim "is always headed by" Brim and that at this particular Talim, Brim told another inmate, Jaison Coleman, that "Islam is the only religion, all other religions fall to Islam . . . that is what Mohammed said . . . Islam will wipe all other religions from the earth." Dkt. 24-3, at 2. Frappier continued his description:

> Coleman again stepped in and said something to Brim and the group . . . . Brim stopped and started in on Coleman saying that this was his Halaqah, meaning circle, and that it was his discussion. Coleman said something again and Brim turned around and walked 3 steps toward Coleman and took off his jacket. Inmate Williams . . . stood up and said that's enough slow down, talking to Brim. . . . I told Brim to back off, Brim knelt down to one knee very close to Coleman and whispered something to Coleman . . . I told Brim to move away from Coleman and he did. . . . . I told Brim to get his pass and that his Talim was done for the day and he took his pass and started walking out of the chapel. . . . I . . . told Coleman that he too was to leave the chapel. Coleman . . . took his Quran and read a passage from it and told the group that this was what the Quran says not what they just had been told. Coleman denied all the "Islam is the only religion" talk that Brim was saying then left the chapel . . . .

*Id.* Frappier then offered his general opinion on Brim:

> Brim is no slouch, he does know his Quran and he does put off the vibe that he knows all and says all, and you better not doubt him. [Brim] push[es] his belief system on everyone else. I call it the "Brim" [Talim] group because Brim is the only one talking in the group and no one else ever says anything unless asked. That is not what a Talim is. Brim has never went on a tirade like the

one he did on the 10th. I can't say he never spoke of wiping out all other religions before, this is just the first time I heard him blatantly say it. . . .

The other group is the group that I refer to as the "real" muslims. They are the one that actually seem to follow the peaceful teachings of Mazin, the [volunteer] religious leader, and the Quran. This group doesn't really have a leader but the closest thing to it would be Harley . . . . Harley told me that . . . Brim was starting a problem for the rest of the Muslims in the group. He said that that was not true Islam it was HISLAM. . . .

I don't claim to be a knowledgeable expert on Islam but from what I have heard and read about radical Islamist trying to recruit in American prisons, this stuff computes. It isn't just this one time when I heard Brim talking about wiping out all other religions for Mohammed, it's the whole Brim consortium of holding basically his private, members only Talim. . . . Brim [is] acting as though he was the only person gifted enough to preach his version of Islam or Hislam. . . . [O]ther inmates approached me and said what Brim is doing is giving them a harder time in the eyes of those who are not Islam in the prison setting.

Dkt. 24-3, at 2–3.

Brim disputes Frappier's description of the incident. He says that Coleman was the disruptive one and that Frappier refused to intervene until Brim "asked Coleman if he wanted to join the group to give his opinion instead of yelling at" them, at which point Frappier immediately told Coleman and Brim to leave the chapel. Dkt. 30, ¶¶ 14, 15. Brim claims that he never said that "Islam will wipe out all other religions." *Id.* ¶ 17.

Frappier did not issue a conduct report or recommend that any specific action be taken regarding Brim; he only wrote the incident report. But Donovan emailed two other GBCI officials about the incident report, explaining that he was "unaware of the entire situation [but w]hen Frap[pier] told [him] what he heard Brim say, it sounded quite extreme for Islam." Dkt. 41-4, at 4. Donovan went on, "I'm concerned if [Brim] is starting to proclaim an extremist form of Islam. . . . Brim's aggressive behavior seemed no different than what we have addressed

with him in the past." *Id.* A supervisor, Captain VandeWalle, reviewed the incident report and suggested that "Brim should possibly be removed from Muslim study groups entirely." *Id.* at 3. Security Director Kind reviewed the incident report and spoke to Donovan. He followed up with an email to Donovan stating, "[W]hat have we done with inmate Brim and him causing problems in the group? I believe we talked and you were going to remove him." *Id.* at 7. On April 24, Donovan suspended Brim's congregate services pass, effectively barring Brim from attending Talim or Jum'ah. He told Brim that the suspension would last "until [he got his] act together." Dkt. 30, ¶ 19. Brim objected and threatened to file a grievance; Donovan said, "Let's see where that gets you." *Id.*

Brim filed a grievance challenging this decision and sent a letter to Donovan. On April 28, Donovan responded that the decision was not his to make. Dkt. 41-4, at 6. On May 18, Michael Haese, the social services director, sent Brim a letter explaining that he was removed from the congregate services pass list for 90 days because of his "disruptive behaviors" during Talim on April 10, which was "not the first occurrence of [Brim] causing disruption while involved in Taleem/Jumah." *Id.* at 2. Kind has since explained, in a declaration prepared during litigation, his reasoning for directing Donovan to suspend Brim's congregate services pass. A "combination of incidents," specifically those on January 13 and April 10, and Brim's "past behaviors" warranted the suspension, Kind says. Dkt. 25, ¶ 9. According to Kind, Brim is a member of the Black Gangster Disciples gang, as are "some other inmates involved in the incidents occurring" during Talim, and in April 2015, officials were actively investigating whether Brim and other Black Gangster Disciples were smuggling drugs into GBCI. *Id.* at 14. In fact, in January 2016, Brim was caught attempting to smuggle marijuana and tobacco into GBCI. *See* Dkt. 25-1. Brim admits that he had "gang affiliations" in his youth, but says that

since "embracing Islam two decades ago" he has not participated in any gang activities. The conduct report about the January 2016 incident says nothing about gang activity. It indicates that Brim admitted that he took marijuana and tobacco from a visitor and that he had "introduced contraband to the institution in the past." *See id.* at 2-3. Brim pleaded guilty to the conduct report. But he now claims that he did not "smuggle drugs into GBCI in January of 2016." Dkt. 30, ¶ 44.

## C. Ramadan

Ramadan began on June 18, 2015. GBCI provides bag meals to inmates participating in Ramadan so that they may eat before sunrise and fast until after sunset. A DIA policy requires inmates requesting such an accommodation to sign up with the chaplain at least 60 days in advance. Dkt. 22-2, at 4. Brim usually fasts during Ramadan. But on the first day of Ramadan in 2015, he did not receive a breakfast bag. Donovan says he never received a request from Brim to participate in Ramadan. *See* Dkt. 49, ¶ 116. Brim says he did. *See* Dkt. 1, ¶ 20. He points to a letter, dated June 19, to Donovan and Social Services Director Haese complaining that he did not receive a Ramadan meal even though he "sent in a request." Dkt. 30-1, at 13. Brim also orally asked Donovan to add his name to the list. *See* Dkt. 30, ¶ 27.

Donovan received the June 19 letter; he does not recall responding to it, but believes Haese did respond. On June 24, Donovan sent Brim a memorandum explaining that Brim had been removed from his religious diet because he ate from a regular breakfast tray, rather than a halal diet tray, twice within six months. Dkt. 30-1, at 14. It's unclear whether Donovan intended this memo to explain why Brim was not receiving Ramadan meals (that is, bag meals before sunrise and after sunset) or simply to explain why Brim was not receiving halal meals

(that is, meals with foods that comply with Islamic law).[2] Brim interpreted Donovan's explanation to concern Ramadan meals, so he sent a second letter to Donovan and Haese denying that he ate a non-halal meal and again requesting to be placed on the Ramadan meal list. Haese responded on June 30 denying the request and explaining that "it is the inmate's responsibility to not only sign-up, but also follow-up with the Chaplain to ensure their [Ramadan meal] request has been received." *Id.* at 16.

Because Brim was not provided with Ramadan meals before sunrise or after sunset, he bought his own food from the canteen to eat at night. When he had no food, he "was forced to beg for items from others or had to just go without." Dkt. 30, ¶ 45.

## ANALYSIS

Defendants move for summary judgment on all of Brim's claims. I begin by identifying the claims at issue. I granted Brim leave to proceed on First Amendment retaliation, free exercise, and RLUIPA claims concerning three actions taken by defendants: (1) the April 2015 removal of his name from the congregate services pass list; (2) the failure to put his name on the June 2015 Ramadan list, and (3) the June 2015 removal of his name from the Halal diet list. Dkt. 7. Brim has chosen not to pursue claims concerning the removal of his name from the Halal diet list, *see* Dkt. 49, ¶¶ 133–55, or RLUIPA claims concerning the 90-day suspension, *see* Dkt. 29, at 31–33, so I will grant summary judgment in defendants' favor on those claims. The parties devoted sizeable portions of their briefs to a retaliation claim concerning the

---

[2] DAI policy provides that an inmate who eats non-Halal foods twice within six months will be removed from the Halal diet. *See* Dkt. 22-2, at 5. But it appears that inmates who eat non-Halal foods may still receive Ramadan meals.

January 2015 conduct report resulting in loss of recreation time, but I never granted Brim leave to proceed on such a claim, so I will not consider it now. *See Anderson v. Donahoe*, 699 F.3d 989, 997-98 (7th Cir. 2012). That leaves Brim's First Amendment retaliation, First Amendment free exercise, and RLUIPA claims concerning (1) the removal of Brim's name from the congregate services pass list for 90 days in April 2015 and (2) the failure to put his name on the June 2015 Ramadan list. I granted Brim leave to proceed on these claims against Donovan and Frappier in their personal capacities. I added Eckstein as a defendant in his official capacity only because he would likely have authority to enforce an injunction under RLUIPA. *See* Dkt. 7, at 5.

I turn now to the merits. To succeed on their motion for summary judgment, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law on the merits. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummet v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in Brim's favor as the nonmoving party. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If Brim fails to establish the existence of an essential element on which he will bear the burden of proof at trial, summary judgment for defendants is proper. *See Celotex*, 477 U.S. at 322.

## A. First Amendment free exercise claims

The First Amendment protects the free exercise of religion, but that protection is not absolute, especially in the prison setting. To survive summary judgment on his free exercise claims, Brim must "submit evidence from which a jury could reasonably find that the

defendants personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016).

### 1. 90-day suspension from congregate services

I start with the 90-day suspension of Brim's congregate services pass. First, Brim has adduced sufficient evidence of Frappier's and Donovan's personal involvement. Section 1983 requires a plaintiff to establish that each defendant "'was personally responsible for the deprivation of a constitutional right.' To be personally responsible, an official 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" *Knight v. Wiseman*, 590 F.3d 458, 462–63 (7th Cir. 2009) (citation omitted) (quoting *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)). A reasonable jury could find that Frappier and Donovan were "personally involved" in the 90-day suspension, *Thompson*, 809 F.3d at 380, because they each facilitated it: Frappier wrote the April 2015 incident report that provoked the suspension, and Donovan emailed two other GBCI officials about the incident report, had a conversation with Kind that resulted in the suspension decision, and actually removed Brim's name from the congregate services pass list. Defendants argue that neither Frappier nor Donovan were personally involved because Security Director Kind made the decision, not them. But the fact that non-parties may also have facilitated the suspension does not negate Frappier and Donovan's responsibility.

Next, there are genuine disputes of material fact concerning whether the suspension was justified. "A burden is unjustified if it is not reasonably related to a legitimate penological interest." *Thompson*, 809 F.3d at 380 (citing *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)). Courts consider several factors when determining whether a prison restriction is reasonably related to a legitimate penological interest: (1) whether there is a "'valid, rational connection'

. . . between the restriction and the legitimate interest put forth to justify it"; (2) whether the inmate had "alternative means of exercising the right"; (3) what effect "accommodation of the asserted constitutional rights" would have on the guards and other inmates; and (4) whether there are "obvious, easy alternatives" to the restriction. *Watkins v. Kasper*, 599 F.3d 791, 796–97 (7th Cir. 2010) (quoting *Turner*, 482 U.S. at 89-90); *see also Tarpley*, 312 F.3d at 898. "Although 'the burden of persuasion is on the prisoner to disprove the validity of a regulation,' prison officials 'must still articulate their legitimate governmental interest in the regulation' and provide some evidence supporting their concern." *Riker v. Lemmon*, 798 F.3d 546, 553 (7th Cir. 2015) (quoting *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011)). "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them," but that deference is not automatic: "the prison administration cannot avoid court scrutiny by reflexive, rote assertions." *Id.* (quoting *Singer v. Raemisch*, 593 F.3d 529, 510, 534 (7th Cir. 2010)). "[T]o warrant deference, prison officials *must present credible evidence* to support their stated penological goals." *Id.* (quoting *Beerheide v. Suthers*, 386 F.3d 1179, 1189 (10th Cir. 2002)).

Defendants argue that the suspension was rationally connected to "maintaining a safe and secure institution." Dkt. 20, at 26. Institutional security is certainly a legitimate interest. *See, e.g.*, *Turner*, 482 U.S. at 89. In general, a suspension of an inmate's congregate services pass could be rationally connected to security. Defendants show that the chapel is "exceptionally vulnerable to security threats" because it is one of the few places at GBCI where inmates can congregate unrestrained, Dkt. 20, at 26; *see* Dkt. 49, ¶ 104, and gang members could use the chapel "as a forum for gang activity." Dkt. 49, ¶ 107. So suspending the congregate services

pass of an inmate who is engaging in gang activity or otherwise inciting violence or causing threatening security in the chapel would clearly be connected to security. But whether Brim was such an inmate is genuinely disputed. Defendants claim that Brim is an active gang member; Brim says he isn't, and hasn't been for over 20 years. Defendants argue that the "ongoing investigation into potentially smuggling drugs into the institution" was sufficient reason to suspend Brim's pass, Dkt. 20, at 27, but they point to no evidence that Brim's activities in the chapel were connected to any potential smuggling, and at the time, the only reason given for the suspension was Brim's conduct during Talim. *See* Dkt. 41-4, at 2, 3, 4, 7. And as Brim points out, any perceived threat of smuggling drugs would have continued past the 90-day mark, yet defendants allowed Brim to return to the chapel at that point. Drawing all reasonable inferences from the evidence in Brim's favor, whether the suspension of his congregate services pass was rationally connected to concerns about gang activity is genuinely disputed.

Defendants argue that Brim's conduct during Talim was reason enough for the suspension: Brim's "increasingly aggressive" demeanor during Talim and his insistence "that all of the members of the group agree with him" created a security threat, they say. Dkt. 20, at 27. Brim agrees that "[c]onfrontations and disagreements of any kind" in the chapel must "be taken seriously." Dkt. 49, ¶ 104. But did Brim's conduct rise to this level? The precise nature of Brim's actions and the context of his speech during the January 13 and April 10 Talim sessions is disputed. Defendants say Brim was incessantly ranting at the January 13 Talim; Brim says he was having a normal religious debate. Defendants say Brim advocated for wiping all other religions from the earth at the April 10 Talim; Brim says he didn't. Defendants say Brim went on a disruptive tirade at the April 10 Talim; Brim says Coleman was the disruptive

one. There are points of agreement: Brim never espoused any extremist views, but he did engage in religious debate, counsel other inmates on how to handle certain religious quandaries, and lead—at least occasionally—a Talim group.[3] But even though some facts are undisputed, the inferences drawn from them are not: defendants indicate that taking on such a leadership position can lead to security problems; Brim says that he caused no security problem and that Frappier and Donovan had approved, or at least not challenged, his acts of leadership in the past. The nature of Brim's behavior during Talim and the effect of his behavior on security are far from clear at this point; there are genuine disputes whether barring Brim from attending Talim for 90 days was rationally connected to prison security. *Cf. Hadi v. Hron*, 830 F.2d 779, 784–85 (7th Cir. 1987) (deeming not clearly erroneous a district court's factual finding, after a bench trial, that allowing inmates to serve as religious leaders could jeopardize prison security).

But barring Brim from Salat al-Jum'ah is another matter. The evidence shows that Brim's authoritative behavior was an issue during Talim, not Salat al-Jum'ah. And Salat al-Jum'ah is presided over by a volunteer Imam, so Brim would not have had an opportunity to become the default leader during that congregate service. The logical connection between barring Brim from attending Salat al-Jum'ah and his behavior during Talim is too remote. *See*

---

[3] Brim considers these actions to be part of his religious exercise and not any violation of prison rules. *See* Dkt. 18 (Brim dep. 16:6–19) (explaining that his religious practice includes asking Muslims around him "to adhere to the faith"). He explains that he sometimes lead a Talim group "by default" because of his knowledge of Islam. Dkt. 18, at 111:19–112:16 ("We like the most knowledgeable person in the group [to lead]. It depends. . . . I led the group by default."); *see also, e.g.*, *id.* at 21:20–23 ("[I]t will be a leader that particular day, if you're using the word 'leader,' but the most knowledgeable person in the group is going to teach the group that day, you know."); *id.* at 29:21 ("I feel that I'm one of [the most knowledgeable people]."). *But see id.* at 78:10–11 ("No, I'm not the leader over there.").

*Turner*, 482 U.S. at 89-90. Defendants have not presented credible evidence connecting the Salat al-Jum'ah ban to a security risk.

The next factor is whether Brim had alternative means of exercising his religious rights. Brim could not engage in the specific religious practices at issue: Talim, which by definition is a group endeavor, and Salat al-Jum'ah, which Brim explains "cannot be performed individually and must be done in congregation proceeded by a sermon." Dkt. 30, ¶ 35. But it is "the ability to participate in other Muslim religious ceremonies," not the particular ceremonies at issue, that matters. *Hadi*, 830 F.2d at 786 (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987)). Defendants point to many religious practices that Brim could still perform without the congregate services pass: studying individually; reading religious books; praying individually; meeting individually with a religious representative. So Brim had alternative means of exercising his religion.

The third factor, the effect of accommodation of Brim's asserted constitutional right on the institution, is tied up with the first. If Brim presented a security threat, his presence at Talim would have had a negative effect on the guards and inmates there. But whether he posed such a threat is genuinely disputed. As for Salat al-Jum'ah, there is no indication that Brim's attendance would have had a negative impact on the guards or inmates.

The fourth and last factor weighs strongly in Brim's favor. There was at least one obvious, easy alternative to the 90-day suspension of Brim's congregate services pass: suspending only Brim's Talim pass would have accomplished defendants' stated goals, as discussed above. I question whether simply barring Brim from leading Talim, warning him that his continued leadership behavior would result in a suspension of his pass, or suspending his participation in Talim for a shorter period might not have been appropriate alternatives, too.

But the bottom line is that the evidence viewed in the light most favorable to Brim shows that the 90-day suspension of Brim's congregate services pass was greater than necessary to address Brim's Talim behavior. Under the version of the facts that I must accept at this point, it was not reasonably related to a legitimate penological interest.

Finally, defendants make no attempt to argue that the 90-day suspension did not substantially burden Brim's free exercise rights, even after Brim argued the substantial-burden element in his response brief, so any challenge to this element is waived. In any event, an outright prohibition of a religious practice is a substantial burden, even if that prohibition lasts for only 90 days.[4] I will deny defendants' motion for summary judgment on the free exercise claim concerning the 90-day suspension.

### 2. Ramadan meal list

I turn next to the failure to add Brim's name to the Ramadan meal list.

Again, Brim adduces evidence of Donovan's personal involvement. Donovan admits that the meal list was his responsibility. Defendants concede the point. But they argue that Frappier was not personally responsible for placing names on the June 2015 Ramadan meal list. Brim does not pursue the Ramadan meal list claims against him, *see* Dkt. 29, at 27–29, so I will grant summary judgment to Frappier on the First Amendment retaliation and free exercise claims for the failure to put Brim's name on the Ramadan meal list.

Defendants do not argue that Donovan's failure was justified, but even if they did, a reasonable juror could infer that it was not. The DAI policy requires prisoners to sign up for

---

[4] In fact, the effects of the suspension continued past the 90-day mark: After the suspension, Brim reapplied for a congregate services pass. He was allowed to return immediately to Salat al-Jum'ah, but he was on a wait list for Talim for two or three weeks until a spot opened up. *See* Dkt. 18, at 95:14–96:24.

Ramadan meals at least 60 days in advance. *See* Dkt. 22-2, at 4. Donovan says he didn't receive a timely request from Brim; Brim says he did. And viewing the evidence in Brim's favor, even if Brim did not sign up 60 days in advance, the failure to allow him to participate in Ramadan would be unjustified for two reasons. First, Donovan admits that he received Brim's June 19 letter asking to be added to the Ramadan meal list, but he never added Brim's name. He says that he did "not have discretion to add an inmate to the Ramadan participation list after the sign-up deadline had passed." Dkt. 49, ¶ 130. But Brim says that Donovan has made exceptions to the 60-day deadline for Ramadan meal requests before. Dkt. 30, ¶¶ 32, 38. So even if Donovan did not receive a timely request from Brim, the evidence viewed in Brim's favor indicates that Donovan was aware that Brim was not on the Ramadan meal list but wanted to be on it, that Donovan could have allowed Brim on the Ramadan meal list, but that Donovan refused to allow Brim to receive Ramadan meals. Second, there's reason to question the justification for the DAI policy itself. Defendants explain that the 60-day deadline is necessary because "[t]he kitchen staff rely on having 60 days' advanced notice of how many inmates will be participating in Ramadan to know how much food to order for the meal bags, and how much less food to order for the general fare meals." Dkt. 49, ¶ 129. Brim does not dispute that explanation, but it rings hollow. Brim isn't complaining that he wasn't given a certain type of food during Ramadan; all he wanted was to be given food to eat before sunrise and after sunset. Why would kitchen staff need 60 days' notice that a particular inmate, or group of inmates, will need their breakfast delivered earlier than normal and their dinner delivered later? The connection between the DAI policy's 60-day requirement and the kitchen staff's need to plan ahead appears to be arbitrary.

Finally, "forcing an inmate to choose between daily nutrition and religious practice is a substantial burden." *Thompson*, 809 F.3d at 380 (reversing summary judgment on a prisoner's free exercise claim concerning the denial of Ramadan meals for two days). That is exactly the choice that Brim was faced with because his name wasn't on the Ramadan meal list. Defendants argue that Donovan's failure to put Brim's name on the Ramadan list did not coerce Brim "into acting contrary to [his] religious beliefs," but merely made it "more difficult." Dkt. 20, at 32 (quoting *Lyng v. Mw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450–51 (1988)). Donovan didn't stop Brim from fasting, they claim, because Brim could still abstain from eating food during the day and eat food he purchased from the canteen at night. Brim simply could not eat GBCI-provided food when he wanted to eat, that is, before sunrise and after sunset. Defendants point out that Brim bought "packaged items, such as Ramen Noodle and chips," from the canteen to break his fast. Dkt. 30, ¶ 45. But Brim also "went without foods for 8–12 days" during Ramadan and "was forced to beg for items from others or had to just go without." *Id.* Just like the plaintiff in *Thompson*, Brim's religious exercise was substantially burdened when he was denied Ramadan meal bags.

Defendants offer one last argument that "Donovan did not intentionally prevent Brim from participating in Ramadan," and therefore the free exercise claim against him necessarily fails. Dkt. 20, at 29. Defendants do not offer much explanation for their position that intent is a required element of any § 1983 claim—they cite only one case, *Daniels v. Williams*, 474 U.S. 327, 331, 333–34 (1986), for the proposition that negligence "is not enough to sustain a claim under 42 U.S.C. § 1983." Dkt. 20, at 31. It's true that *negligence* does not suffice; to prevail on a First Amendment claim under § 1983, a plaintiff "must establish that [the defendant] acted or failed to act with intentional or reckless disregard for plaintiff's rights or

that the conduct causing the deprivation occurred at [the defendant's] direction or with his knowledge and consent." *Morales v. Cadena*, 825 F.2d 1095, 1101 (7th Cir. 1987). Intent is not required; recklessness is sufficient.[5] And here, Donovan admits that he knew on the second day of Ramadan that Brim was not getting Ramadan bag meals but did nothing—not to mention the evidence, viewed in Brim's favor, indicates that Donovan knew Brim always fasted during Ramadan and requested Ramadan bag meals before Ramadan began in 2015. A reasonable jury could find that Donovan failed to act in reckless disregard of Brim's rights.

I will deny defendants' motion for summary judgment on the free exercise claim concerning Ramadan.

## B. First Amendment retaliation claims

Brim contends that the decision by Donovan and Frappier to suspend his congregate services pass for 90 days and the decision by Donovan to place his name on the Ramadan meal list were made in retaliation for Brim's exercise of his religious rights. To prevail on his First Amendment retaliation claims, Brim must show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in Donovan's and Frappier's decisions to take those actions. *McGreal v. Village of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017). The overarching

---

[5] Brim would have to prove intent if he wished to recover punitive damages. *See Thompson*, 809 F.3d at 381 ("If a trier of fact credits Thompson's evidence that the defendants intentionally violated his rights, he may receive both nominal and punitive damages."); *Calhoun v. DeTella*, 319 F.3d 936, 942 (7th Cir. 2003) ("[Under § 1983, punitive damages are only available] upon a showing of 'evil motive or intent, or . . . reckless or callous indifference to the federally protected rights of others.'" (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). But defendants have not moved for summary judgment on the types of damages that Brim could recover, so I need not decide this issue now.

question is whether Brim's speech is protected by the First Amendment: disruptive speech is not, but non-disruptive religious observance is. The question is answered using the four factors of the legitimate-penological-interest test used in free exercise claims, which apply with equal force to the first element of retaliation claims. *See Watkins*, 599 F.3d at 795.

### 1. 90-day suspension from congregate services

Defendants do not dispute that the 90-day suspension of Brim's congregate services pass would likely deter a person of ordinary firmness from engaging in protected speech. Nor do they dispute that the 90-day suspension was issued because of Brim's behavior at Talim (among, perhaps, other ongoing issues, such as Brim's gang membership and drug smuggling). The real issue is whether Brim's behavior during Talim was protected by the First Amendment. Again, factual disputes about the nature of Brim's speech and its relationship to institutional security preclude entry of summary judgment on this claim. If Brim was truly disruptive and posed a security risk, then his speech was not protected by the First Amendment. But if his pure religious speech motivated Frappier and Donovan to encourage the suspension of his congregate services pass, then he may prevail on his retaliation claims.

### 2. Ramadan meal list

Likewise, the undisputed evidence shows that Donovan's failure to place Brim's name on the Ramadan meal list resulted in a deprivation likely to deter a person of ordinary firmness from engaging in protected speech. Viewing the facts in the light most favorable to Brim, his speech at Talim was protected by the First Amendment, for reasons discussed above. And that speech was at least a motivating factor in Donovan's decision to omit his name from the list: Donovan does not dispute that he knew about Brim's purportedly protected speech—Donovan forwarded Frappier's incident report about Brim's behavior to other GBCI officials and met

with Security Director Kind about it in mid-April. And the evidence shows suspicious timing. The 60-day deadline for signing up for Ramadan meals was in mid-April, right after Frappier wrote the incident report and right before Kind met with Donovan, leading to the decision to suspend Brim's congregate services pass.

Defendants argue that Donovan did not intentionally bar Brim from receiving Ramadan meals. I'll interpret this as a challenge to the motivating-factor element. Brim "must produce evidence that his speech was 'at least a motivating factor . . . of [Donovan's] decision to take retaliatory action against him.'" *McGreal*, 850 F.3d at 312 (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)). He makes this showing, so then the burden shifts to defendants to offer an alternative explanation or show that Donovan would have made the same decision in the absence of the protected speech. *Id.* at 313. If defendants do so, "the burden shifts back to [Brim] to 'demonstrate that [Donovan's] proffered reason was pretextual and that the real reason was retaliatory animus.'" *Id.* (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012)).

Defendants argue that Donovan didn't put Brim's name on the Ramadan list because he never received a request from Brim, or if he did, Donovan simply lost it without any intent to interfere with Brim's religious observance. That's entirely possible, of course, but Brim points to evidence that Donovan intentionally ignored his requests: Brim sent Donovan a letter explaining that he had requested Ramadan bag meals at the beginning of Ramadan, and Donovan did not respond, even though he had added Brim's name to the meal list after the beginning of Ramadan in years past. A reasonable juror could find that Donovan declined to place Brim's name on the Ramadan meal list because of Brim's religious speech at Talim. So

I'll deny summary judgment on Brim's retaliation claim against Donovan concerning the Ramadan meal list.

## C. Qualified immunity under the First Amendment

Defendants contend that they are entitled to qualified immunity on all of Brim's First Amendment claims. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A plaintiff bears the burden of establishing that the constitutional right was clearly established. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). In their opening brief, defendants argued that Brim could not "prove that he has a clearly established right to attend services despite his repeated disruptive behavior" or that he has a clearly established "right to be free from negligently" failing to put his name on the Ramadan list. Dkt. 20, at 40. Brim did not specifically address these qualified-immunity arguments in his response brief; defendants argue that as a result, they are entitled to judgment in their favor on each constitutional claim. *See* Dkt. 48, at 16.

The fundamental flaw in defendants' qualified-immunity arguments is that they assume their own version of the facts. They don't argue that Brim's First Amendment right to participate in religious ceremonies wasn't clearly established—nor could they, as that right was well established in 2015. *See, e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 269 (1981) ("[E]ngag[ing] in religious worship and discussion . . . . are forms of speech and association protected by the First Amendment."); *Thompson*, 809 F.3d at 381 ("[A] prisoner has a 'clearly established . . . right to a diet consistent with his . . . religious scruples,' including proper food during

Ramadan." (quoting *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003)). Instead, their qualified-immunity arguments assume the facts at issue in this case: that Brim behaved disruptively and that Donovan's failure to put Brim's name on the Ramadan meal list was accidental. Brim genuinely disputed these facts and he responded to defendants' substantive arguments, so he hasn't waived any arguments on qualified immunity.

Brim's right to practice his religion was clearly established, and, just like in *Thompson*, "the evidence supports an inference that the defendants intentionally and unjustifiably" violated that right, so "qualified immunity is unavailable." 809 F.3d at 381. *Thompson* dealt only with free exercise claims. Its reasoning applies to retaliation claims, too, but even if it didn't, qualified immunity usually does not apply in retaliation cases "because the jurisprudence prohibiting retaliatory acts against prisoners [for First Amendment–protected activities] is well-established." *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996) (quoting *Penrod v. Zavaras*, 94 F.3d 1399, 1404–05 (10th Cir. 1996)).

## D. RLUIPA claim

RLUIPA prohibits the government from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution," unless "that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). Plaintiffs can obtain only declaratory and injunctive relief through RLUIPA, not damages. *See Grayson v. Schuler*, 666 F.3d 450, 541 (7th Cir. 2012); *Vinning-El v. Evans*, 657 F.3d 591 (7th Cir. 2011). So when a plaintiff's religious exercise is no longer burdened, such as when an inmate is released from prison, RLUIPA "can no longer do him any good." *Id.* In other words, the claim is moot when the burden ends.

Defendants argue that Brim's sole remaining RLUIPA claim, which concerns the failure to provide him with Ramadan meal bags, is moot because Ramadan is done for the year and Brim successfully signed up for Ramadan meals in 2016. But the "voluntary cessation of a challenged practice does not necessarily moot a case." *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009). Brim may be entitled to prospective injunctive relief if "there exists some cognizable danger of recurrent violation, something more than the mere possibility." *Id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). A theoretical possibility "supported only by speculation and not evidence" will not suffice. *Id.*

Here, Brim's RLUIPA claim centers on Donovan's failure to place his name on the Ramadan meal list in 2015. He successfully participated in Ramadan in 2016 and 2017. So although defendants have not changed their Ramadan meal policy, it is not currently burdening Brim and there is no more than a theoretical possibility that it will burden him in the future. Any retaliation by Donovan has long since passed, so Brim cannot obtain any relief under RLUIPA. His claim is moot, so I will grant summary judgment in defendants' favor on the sole remaining RLUIPA claim.

## ORDER

IT IS ORDERED that:

1. Defendants Chaplain Mike Donovan, Corr. Officer II Frappier, and Scott Eckstein's motion for summary judgment, Dkt. 19, is GRANTED in part and DENIED in part. Defendants are granted summary judgment on the following claims:

   a. All claims concerning the Halal meal list.

   b. All claims against Frappier concerning the Ramadan meal list.

   c. All RLUIPA claims.

2.  All other claims remain for trial.

Entered September 7, 2017.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge